609 F.2d 1294
 61 A.L.R.Fed. 346, 5 Fed. R. Evid. Serv. 477
 UNITED STATES of America, Plaintiff-Appellee,
v.
Arden Lee SMITH aka Alfredo Lama, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Leroy JONES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Doe CURLEY, aka Ernest Crayton, Defendant-Appellant.
 Nos. C.A. 78-1532, C.A. 78-1549 and C.A. 78-1620.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 21, 1979.
 
 1
 James L. Tanner, Michael C. Monson, Phoenix, Ariz., argued for defendants-appellants; Michael D. Kimerer, Phoenix, Ariz., on the brief.
 
 
 2
 Daniel R. Drake, Asst. U. S. Atty., Phoenix, Ariz., for plaintiff-appellee.
 
 
 3
 Appeal from the United States District Court for the District of Arizona.
 
 
 4
 Before WALLACE and TANG, Circuit Judges, and THOMPSON,* District Judge.
 
 GORDON THOMPSON, Jr., District Judge:
 
 5
 Arden Lee Smith, also known as Alfredo Lama (Lama), Leroy Jones, and John Doe Curley, also known as Ernest Crayton (Crayton), appeal their convictions under 21 U.S.C. § 846 (1976) for conspiracy to possess heroin and cocaine with intent to distribute. The issues concern (1) the sufficiency of the evidence to support their convictions and, as a related matter, the district judge's refusal to sever their trials, (2) the admissibility of certain hotel receipts and an American Express card, and (3) the government's failure to abide by the requirements of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1962). We affirm.
 
 
 6
 The case involves a large drug operation in which eighteen defendants participated. The trial court ordered a severance, and the defendants were tried in three separate proceedings. The government's principal witnesses at the trial of these appellants were Steven Smith and Bobbi Herrin, who participated in the conspiracy. Smith dealt in marijuana and, through Herrin, met Lama at the Americana Hotel in Nogales, Arizona, in October, 1973. At that meeting, Lama agreed to supply Smith with heroin and cocaine.
 
 
 7
 Within a short time, Smith became a middleman for Lama, distributing narcotics supplied by Lama to retail dealers in Phoenix and Los Angeles. Jones, who worked with one Elmer Weaver, carried on retail dealings in Phoenix. Crayton ran the Los Angeles retail operation. Lama also supplied drugs to Fred Pedote, a retailer in Chicago.[1] Smith was introduced to Crayton, Jones, and Weaver by Lama at various meetings in hotels in Los Angeles and Tucson. By the time of his arrest in June of 1974, Smith had sold more than $120,000 in heroin and cocaine to Weaver and $40,000 to $50,000 in narcotics to Crayton. R.T. 327-28. Herrin's testimony corroborated Smith's statements that meetings took place at hotels at which narcotics transactions among Lama, Smith, and one or another of the retailers took place. Herrin also testified that she, acting as a distributor for Lama, had engaged in at least ten to fifteen heroin transactions with Weaver from March to September, 1974.
 
 SUFFICIENCY OF THE EVIDENCE AND SEVERANCE
 
 8
 A. The Appropriate Test.
 
 
 9
 Jones[2] does not argue that initial joinder under Fed.R.Crim.P. 8 was improper. See United States v. Valenzuela, 596 F.2d 824, 829 (9th Cir. 1979). He maintains, however, that the evidence showed three conspiracies between Lama and Jones, between Lama and Crayton, and between Lama and Pedote rather than the single conspiracy charged in the indictment. Therefore, he says, evidence as to the Lama-Crayton and the Lama-Pedote conspiracies should not have been admitted in a trial of the Lama-Jones conspiracy. The variance between the indictment and the proof at trial, he claims, thus prejudiced him, and the trial court abused its discretion under Fed.R.Crim.P. 14 in refusing to sever his trial. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Jones also argues the evidence was insufficient to support the conviction.
 
 
 10
 The trial court did not err under Rule 14 if the government produced sufficient evidence for the jury to conclude the defendant was guilty of the overall conspiracy charged in the indictment. See United States v. Kearney, 560 F.2d 1358, 1362-63 (9th Cir.), Cert. denied, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977). The question is whether the government met that standard. To produce sufficient evidence, the government need not provide direct evidence that the defendant had an illegal agreement with the other alleged co-conspirators. See Iannelli v. United States, 420 U.S. 770, 777 n.10, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). Rather, the test is whether the government has produced enough evidence for a factfinder to conclude beyond a reasonable doubt 1) that the charged conspiracy existed, 2) that the defendant had at least a slight connection to it, and 3) that the defendant knew he was connected to the charged conspiracy. See United States v. Eaglin, 571 F.2d 1069, 1976-77 (9th Cir. 1977), Cert. denied, 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978); United States v. Dunn, 564 F.2d 348 (9th Cir. 1977). Whether the government has produced sufficient evidence depends on all the facts. See United States v. Direct Sales Co., 319 U.S. 703, 709-15, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); United States v. Monroe, 552 F.2d 860, 862-63 (9th Cir. 1977).[3]
 
 
 11
 Jones suggests that in United States v. Baxter, 492 F.2d 150 (9th Cir.) Cert. dismissed, 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973), Cert. denied, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974), this circuit established a different test for proof of the defendant's participation in the charged conspiracy.[4] The defendants in Baxter were retailers in a scheme to distribute narcotics from Mexican suppliers through American dealers. Since the government could not prove an illegal conspiracy with direct evidence, it relied on circumstantial evidence. On appeal, the defendants claimed this evidence was insufficient to support their convictions; they also argued that the district judge's failure to sever their trials constituted reversible error.
 
 
 12
 The court affirmed the convictions of all defendants. It stated,
 
 
 13
 even though the defendant retailers did not directly conspire with each other in this over-all undertaking, if each knew, or had reason to know, that other retailers were involved with the Hernandez organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the jury could find that each had, in effect, agreed to participate in the over-all scheme. This would be true even though the individual defendants were not aware of the identity, number or location of the other participating retailers.
 
 
 14
 Id. at 158 (citations and footnotes omitted). Jones argues that Baxter set up a test for judging the sufficiency of the evidence in conspiracy cases, in which the government must show (1) that the defendant knew or should have known of other retailers, and (2) that the defendant had reason to believe his benefits "were probably dependent upon the success of the entire venture."
 
 
 15
 Although this circuit has purportedly applied the quoted language from Baxter in succeeding cases, See, e. g., United States v. Kostoff, 585 F.2d 378, 380 (9th Cir. 1978); United States v. Perry, 550 F.2d 524, 528-29 (9th Cir.), Cert. denied, Ware v. U. S., 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 228, 434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977), Baxter did not set up a separate or exclusive "test" for evaluating the evidence in conspiracy cases. The Baxter court recognized the competing interests at work in proving a conspiracy charge against the defendant. On the one hand, because conspiracies by their nature tend to be secretive, the government may prove its case through circumstantial as well as direct evidence. Blumenthal v. United States, 332 U.S. 539, 556-57, 68 S.Ct. 248, 92 L.Ed. 154 (1947). On the other hand, a defendant cannot be guilty of the charged conspiracy if he does not even know it exists. The Baxter court pointed out that the defendant Quinn's conviction was reversed in Daily v. United States, 282 F.2d 818 (9th Cir. 1960). The indictment in that case charged a conspiracy to burglarize drug stores and to sell the stolen narcotics through retailers. Quinn bought some stolen drugs from the other defendants. Since the government failed to show that Quinn had reason to believe that his suppliers might have gotten their drugs through a conspiracy to rob drug stores, however, the defendant lacked the knowledge necessary to sustain his conviction.
 
 
 16
 Consequently, the test in Baxter was simply another way of saying that the government may not convict a defendant of conspiracy merely by showing his connection, albeit unwitting, to the unlawful agreement. Rather, the government must also prove beyond a reasonable doubt that the defendant Knew of his connection to the conspiracy charged by the government. Baxter points out the facts which, among others, the jury may take into consideration in evaluating the defendant's connection to and knowledge of the charged conspiracy.[5] As this court stated in response to a related argument in United States v. Kearney, 560 F.2d 1358, 1362 n.2 (9th Cir.), Cert. denied, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977),
 
 
 17
 Appellants rely on United States v. Hutul, 416 F.2d 607 (7th Cir. 1969), Cert. denied, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970), for the proposition that a single conspiracy is indicated by the presence of factors such as a short time span of operations and a small number of conspirators, factors they submit are absent here. Even assuming that the Hutul test is valid, however, the court there nowhere suggests that those criteria constitute the Exclusive determinants for the presence of a single conspiracy.
 
 
 18
 (Emphasis in original.)
 
 
 19
 B. The Test Applied to the Facts.
 
 
 20
 A jury could conclude beyond a reasonable doubt that Jones and Crayton were guilty of the overall conspiracy charged, rather than of participation only in separate, "smaller" conspiracies, because it could conclude beyond a reasonable doubt 1) that the charged conspiracy existed, 2) that Jones and Crayton had at least slight connections to it, and 3) that Jones and Crayton knew their individual connections constituted a part of that larger conspiracy. The indictment charged a conspiracy to obtain heroin and cocaine from Mexican sources and to store the drugs pending distribution to points in Arizona and elsewhere. Evidence that this conspiracy existed among Lama, Smith, and Herrin was overwhelming, for both Smith and Herrin admitted on the stand their arrangements to obtain drugs from Lama and to pass on the drugs to various retailers.
 
 
 21
 The evidence also proved beyond a reasonable doubt that Jones had at least a slight connection to this conspiracy as a retailer for Smith, Herrin, and Lama. Smith testified that in early November, 1973, "I was introduced to Elmer (Weaver) and Leroy (Jones) and Alfredo Lama informed him that I would be warehousing cocaine and heroin while he wasn't in town and they could call me and make arrangements to pick up from me and drop money off to me." R.T. 139, 141. Lama sold some heroin to Jones at that time for "(n)umerous thousands of dollars." R.T. 154, 156. Jones paid Lama money that Jones owed for cocaine and heroin, and Jones and Lama decided that "Elmer would be picking up cocaine and heroin from (Smith) and dropping money off to (him)." R.T. 157. In the succeeding months, Smith and Herrin made twenty deliveries of narcotics through Weaver to Jones. R.T. 271. Jones attended some of these meetings between Smith, Herrin, and Weaver. R.T. 264.
 
 
 22
 Similarly, the evidence showed beyond a reasonable doubt at least a slight connection between Crayton and the charged conspiracy. See United States v. Thomas, 586 F.2d 123, 127-29 (9th Cir. 1978). In a December, 1973, meeting in Los Angeles, Lama introduced Smith and Herrin to Crayton as distributors. Over the succeeding months, Crayton regularly contacted Herrin or Smith every three or four weeks. R.T. 268. In all about ten transactions in cocaine and heroin worth $40,000 to $50,000 took place.
 
 
 23
 Finally, the evidence shows beyond a reasonable doubt that Jones and Crayton knew they were part of the charged conspiracy. The commodity with which they dealt was narcotics. The jury could conclude Jones and Crayton knew that drugs are frequently dispensed through a network of suppliers, wholesalers, and scattered retailers in different states and therefore that they were not Lama's only retailers. See United States v. Burman, 584 F.2d 1354, 1357 (4th Cir. 1978); United States v. Moten, 564 F.2d 620, 624-26 (2d Cir.), Cert. denied, 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977). Compare Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (housing loans). Jones and Crayton, moreover, dealt in heroin. "Heroin is, of course such a diabolic drug in itself that the trafficking in it raises many unfavorable inferences." United States v. Heath, 580 F.2d 1011, 1023-24 (10th Cir. 1978). Finally, the very size of the sales $120,000 by Jones and $40,000 to $50,000 by Crayton and the frequency and regularity of receipt are "persuasive of the existence of a continuing chain conspiracy and the knowing participation of the actors at each level in the ongoing venture." United States v. Moten, 564 F.2d 620, 626 n.7 (2d Cir.), Cert. denied, 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977), Quoting United States v. LaVecchia, 513 F.2d 1210, 1220-21 (2d Cir. 1975). See also Blumenthal v. United States, 332 U.S. 539, 554 n.14, 555 n.16, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Burman, 584 F.2d 1354, 1357 (4th Cir. 1978). The jury could reason that each defendant " 'knew from the scope of the operation that others were involved in the performance of functions vital to the success of the business.' " United States v. Moten, 564 F.2d 620, 625 (2d Cir.), Cert. denied, 434 U.S. 959, 98 S.Ct. 489 (1977), Quoting United States v. Bynum, 485 F.2d 490, 496 (2d Cir. 1973), Vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974).[6]
 
 
 24
 Jones argues that the evidence showed he never met with the other retailers. The government, however, need not show "that an alleged co-conspirator knew all of the purposes of and all of the participants in the conspiracy." United States v. Kearney, 560 F.2d 1358, 1362 (9th Cir.) Cert. denied, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977). See Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947).
 
 
 25
 Thus, the evidence was sufficient for the jury to find that Jones and Crayton knowingly participated in the charged conspiracy. Moreover, the trial judge carefully instructed the jury on the distinctions between single and multiple conspiracies. R.T. 802-03. Compare United States v. Eubanks, 591 F.2d 513, 517-18 (9th Cir. 1979). In light of these instructions and the evidence, Judge Muecke did not err in denying the motions to sever. See United States v. Kearney, 560 F.2d 1358, 1362-63 (9th Cir.), Cert. denied, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977); United States v. Murray, 492 F.2d 178, 185 (9th Cir. 1973), Cert. denied, Roberts v. U. S., 419 U.S. 854, 942, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974).
 
 
 26
 Jones asserts a further ground for severing his trial from that of the other defendants. Because of the difficulty the jury must have had in "compartmentalizing" the evidence as to each defendant, Jones suffered prejudice as a result of guilt by association. Jones also argues that repeated references to him and Weaver as a team by the government's attorney and by the witnesses was prejudicial. The testimony indicated, however, that Jones and Weaver were in fact a team. Furthermore, the trial court instructed the jury to consider the evidence adduced at trial separately as to each defendant. R.T. 52, 798, 803. The court's instructions protected Jones from guilt by association and complied with the law of this circuit as defined in United States v. Cozzetti, 441 F.2d 344 (9th Cir. 1971).
 
 ADMISSIBILITY OF DOCUMENTS
 
 27
 A. Hotel receipts.
 
 
 28
 Certain hotel records were introduced into evidence by the government at trial. These documents reflected the registration of, and charges incurred by, Lama at the hotels. They were introduced to corroborate the testimony of governmental witnesses that Lama attended meetings on particular dates at the hotels at which drug deals were planned and completed. Lama asserts that, because the records were not kept for the purpose of verifying the identity of the person who fills out the form, the records should not have been admitted. He cites Standard Oil Co. v. Moore, 251 F.2d 188 (9th Cir. 1957).
 
 
 29
 Fed.R.Evid. 803(6)[7] governs the admissibility of business records and does not contain the limitation suggested by Lama on the purposes for which business records may be introduced into evidence. Standard Oil, an antitrust suit, is distinguishable. To prove the existence of an unlawful agreement, the plaintiff in that case introduced into evidence business records dealing with the pricing and marketing policies of oil companies other than the company in whose files the records were found and records concerning the policies and practices of service station operators who were not customers of the company in whose files the records were found. The court held that these records had been improperly admitted under 28 U.S.C. § 1732 (1952) (amended 1975),[8] because "a writing which does not pertain to a matter in which the business was a direct participant, but to some incident, circumstance, or activity outside that business, is not a memorandum or record of an 'act, transaction, occurrence, or event' within the meaning of" the section. 251 F.2d at 213. In Lama's case, however, the records admitted related to the registration and billing of guests, a matter in which the hotel was a direct participant.
 
 
 30
 Lama also notes that the employees of the hotels who testified at trial concerning the records were not employed by the hotels at the time Lama stayed in them. Therefore, they could not have identified Lama as the person who signed the records. Additionally, Smith had never seen the exhibits prior to trial, and had no independent recollection of the facts contained in them. These factors, Lama asserts, lead to the conclusion that there was insufficient foundation for admitting the records; their authenticity was inadequately shown.
 
 
 31
 The records, however, could be properly admitted into evidence without direct evidence as to their authenticity. Circumstantial evidence connecting Lama with the documents was sufficient. "The issue for the trial judge in determining whether the required foundation for the introduction of the evidence has been established is whether the proof is such that the jury, acting as reasonable men, could find its authorship as claimed by the proponent." Carbo v. United States, 314 F.2d 718 (9th Cir. 1963), Cert. denied, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964). Considerable circumstantial evidence linked Lama to the business records he was alleged to have signed, including (1) the testimony of two witnesses that Lama had called and attended the meetings at the motels on the dates the records were signed, (2) the fact that the names signed on the records were names Lama used, and (3) the fact that the address given on the registration form was an address on Lama's business card.
 
 
 32
 Nor does it matter that the employees did not work at the hotels when Lama allegedly stayed there.
 
 
 33
 (I)t is not necessary that a sponsoring witness be employed by the business at the time of the making of each record. The witness must only be in a position to attest to its authenticity. Each of these sponsoring witnesses testified in some detail regarding the record-keeping processes of (the hotels). All . . . of the witnesses, of course, were available for Voir dire and cross-examination regarding their familiarity with the records and the degree of reliance placed upon such records by the company. Further objections, relating to the identity or competency of the actual preparer, may have been relevant to the evidentiary weight or credibility of the documents, but did not effect (sic) their admissibility.
 
 
 34
 United States v. Evans, 572 F.2d 455, 490 (5th Cir.), Cert. denied, Tate v. U. S., 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).
 
 
 35
 This court's review is limited to determining whether the trial court abused its discretion in deciding that the government made a prima facie showing as to the authenticity of the documents. United States v. Scully,546 F.2d 255, 269 (9th Cir. 1976), Cert. denied, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). The trial court properly submitted the issue of the documents' authenticity to the jury.
 
 
 36
 B. American Express card.
 
 
 37
 The government called Theodore Groder, custodian of records for American Express Company, to testify concerning Government's Exhibit 10-B, an American Express card issued to Alfredo Lama that was seized from Lama in March, 1977. Groder also testified that Government's Exhibit Six, an American Express Card billing, was a charge to the same account for which Exhibit 10-B was issued. There was some confusion as to whether Exhibit Six related to the same account for which Exhibit 10-B was issued, because the account numbers appearing on the exhibits are not identical. Groder explained that, although the numbers differed, both exhibits relate to the same account. R.T. 198-214. The numbers on the exhibits differ, because Exhibit Six represents a charge that was made through the use of a supplemental credit card. A supplemental card is usually issued to the spouse of a credit card holder, and the account number it bears differs from the number on the original card. All charges made on a supplemental credit card, however, are billed to the original account.
 
 
 38
 Lama asserts the trial court erred in admitting Exhibit 10-B. According to him, it was only by means of Exhibit Six that Groder was able to identify Exhibit 10-B. When admitted into evidence, however, Exhibit Six had been altered from when Groder testified, and the court did not consider whether, given the changes made in Exhibit Six at the time Exhibit 10-B was admitted, there was sufficient foundation for admitting Exhibit 10-B.
 
 
 39
 The record does not support these assertions. Groder did not need Exhibit Six to identify Exhibit 10-B. He simply testified that, despite differences in the account numbers, Exhibits Six and 10-B relate to the same account. Moreover, Lama does not state in what manner Exhibit Six was changed and how such changes affected the identification Groder made. The trial court did not abuse its discretion in admitting Exhibit 10-B.
 
 BRADY
 
 40
 The trial court ordered the government to produce, three days prior to trial, all material it is required to turn over to the defense pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1962). A 150-page Drug Enforcement Administration report concerning an investigation of Herrin, however, was not given to the defense until after Herrin began testifying. The court denied a motion to strike Herrin's testimony and to preclude her from testifying further. Lama now asserts that his due process rights were violated when the government failed to produce this report in accordance with the court's order. Lama states that, although the government had had the report for five to ten days before trial, he was given less than an hour and a half to examine it. Moreover, the court was "not . . . at all interested in . . . defense objections" to the government's conduct, and the delay in producing the report precluded defense counsel from effectively using it to impeach Herrin.
 
 
 41
 Assuming Lama had preserved his objections,[9] there was no due process violation in light of the trial court's handling of the situation. Contrary to Lama's assertion, Judge Muecke was both deeply concerned and annoyed at the government's failure to produce the report three days prior to trial. More importantly, he offered defense counsel an opportunity to recall Herrin as a witness on the following day to cross-examine her on anything found in the report, and he told counsel that if the court were informed of anything of significance found in the report then it would reconsider its decision to deny the motion to strike. R.T. 522, 525. These actions sufficiently protected Lama from any prejudice in the delayed disclosure. See United States v. Miller, 529 F.2d 1125, 1128-29 (9th Cir.), Cert. denied, 426 U.S. 924, 96 S.Ct. 2634, 49 L.Ed.2d 379 (1976).
 
 
 42
 The judgments are AFFIRMED.
 
 WALLACE, Circuit Judge, concurring:
 
 43
 While I concur with the majority, I add my understanding of the thrust of United States v. Baxter, supra, 492 F.2d 150, as applicable to this case. Baxter does nothing more than allow circumstantial evidence to convict a defendant of participating in an entire conspiracy when he did not conspire directly with some of the participants. After proving the other requirements of a conspiracy, a defendant may be convicted if he "knew, or had reason to know, that other retailers were involved" and "had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture." Id. at 158.
 
 
 
 *
 Honorable Gordon Thompson, Jr., United States District Court, Southern District of California, sitting by designation
 
 
 [1]
 Pedote was also tried in the proceeding below. Smith, however, did not deal with Pedote. Pedote's conviction is not appealed in this proceeding
 
 
 [2]
 Counsel for Lama and Jones have submitted briefs raising issues on appeal. Crayton has not filed a separate brief but has joined in all matters raised by Lama and Jones
 
 
 [3]
 Proof of the conspiracy's existence and of the defendant's knowing connection, of course, does not require the jury to find him guilty of a violation of 18 U.S.C. § 371 (1976). It does, however, permit the jury to infer an illegal agreement, which "remains the essential element of the crime." Iannelli v. United States, 420 U.S. 770, 777 n.10, 95 S.Ct. 1284, 1290 n.10, 43 L.Ed.2d 616 (1975)
 
 
 [4]
 Baxter was one of four opinions handed down on the same day in a group of related cases. See also United States v. Murray, 492 F.2d 178 (9th Cir. 1973), Cert. denied, 419 U.S. 854, 942, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974); United States v. Valdivia, 492 F.2d 199 (9th Cir. 1973), Cert. dismissed, Baxter v. U. S., 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38, Cert. denied, Harris v. U. S., 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); United States v. Mickens, 492 F.2d 211 (9th Cir. 1973), Cert. denied, 416 U.S. 990, 94 S.Ct. 2398, 40 L.Ed.2d 768 (1974)
 
 
 [5]
 As noted in United States v. Dunn, 564 F.2d 348, 357 n.21 (9th Cir. 1977), the Fifth Circuit has adopted a rule that "slight additional evidence suffices to base an inference that one who had been shown beyond a reasonable doubt to be a participant was as well a Knowing participant." United States v. Alvarez, 548 F.2d 542, 544 (5th Cir. 1977) (emphasis in original)
 
 
 [6]
 We think this is what the Baxter court meant when it said the defendants had reason to believe their benefits "were probably dependent upon the success of the entire venture."
 
 
 [7]
 Both sides treat the records as hearsay that may or may not be admissible under the business records exception of Fed.R.Evid. 803(6). Since the records contain Lama's signature, they may more appropriately be regarded as nonhearsay admissions under Fed.R.Evid. 801(d)(2)(A) and 801(d)(2)(B). If so, compliance with the requirements of Fed.R.Evid. 803(6) is irrelevant. We need not decide whether the documents were admissions, however, since they are admissible under the business records exception
 
 
 [8]
 The pertinent parts of this statute prior to amendment were virtually identical to Fed.R.Evid. 803(6)
 
 
 [9]
 Lama has not stated what Brady material the report contained, why this material was Brady material, or how earlier disclosure would have aided his defense